# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 66795-5-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MATTHEW GARETT SILVA, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 22, 2013 |

GROSSE, J. — Following a bench trial at which the court found Matthew Silva guilty of first degree robbery, Silva filed motions for a new trial, relief from judgment, and a stay of execution of the judgment. He appeals the court's rulings denying those motions. Because the rulings were within the court's discretion, we affirm.

## FACTS

Based on evidence that Silva demanded and forcibly took money from a savings and loan bank teller, the State charged him with first degree robbery.

At trial, Kimberly Gregg testified that around 12:30 p.m. on April 5, 2004, Silva visited her place of work, Specialty Auto Sales. Gregg knew him from prior visits. On this day, Silva was agitated, pacing, and twitching. His mood alternated between nice and volatile. Gregg believed he was "jonesing really bad." She explained that "jonesing" refers to the withdrawal people go through as they come down from a drug high. She was familiar with drug behavior from her work as an Emergency Medical Technician and had seen Silva both when he was high and when he was coming down from a high. Gregg thought Silva was coming down on this occasion.

Silva told Gregg that "he needed a faster car . . . ." As he became more agitated, Gregg became concerned about cash sitting on her desk and covered it with some paperwork. She testified that she had never seen Silva like this and that he "scared the crap out of [her]." After 20 to 30 minutes, Silva left in his car.

About four hours later, a robbery occurred at the Federal Way branch of Washington Federal Savings and Loan. Washington Federal employees testified that Silva parked his car at the front door of the bank in a spot that was not an actual parking space. He was disheveled and not wearing a disguise of any kind. He entered the bank carrying an envelope in one hand and a car radio in the other. The radio had wires hanging out of it, as if it had been pulled out of a dash board. Silva held the radio by the wires and swung it back and forth.

Silva walked up to the teller window of Carrie Ridlon. He set the radio down, asked about the bank's surveillance cameras, and said "this is a robbery." He told Ridlon that "people from the [I]nternet were trying to get him" and that "someone was going to pay. [Ridlon] was going to pay." Although some of Silva's statements did not make sense, he spoke clearly, walked normally, and showed no physical signs of intoxication. At one point, he said in a loud voice that his name "was Matt Silva and that he wanted to get caught."

When Ridlon did not immediately produce any money, Silva raised his voice and demanded $3,000. Ridlon hesitated. Silva then said his name and wrote it on an envelope. He said "he didn't want to go to jail" and that he was leaving the

radio and envelope behind as evidence. When a manger said he could not leave his evidence there, Silva asked for $1,000 in hundreds.

Ridlon took out ten $100 bills but did not hand them to Silva. He then grabbed them from her hand, said "thank you," and left the bank. An employee took down Silva's license number.

Several hours later, Washington State Trooper Nicholas Brewer saw Silva's vehicle on Interstate 5. Trooper Nicholas and another trooper activated their vehicle lights, but Silva continued to drive another four to five miles. The troopers eventually used their vehicles to forcibly stop Silva's vehicle.

Silva's speech was slurred and he smelled like liquor. He told the troopers that "people [are] all under [the] control of the government and they're brainwashed." He also said he did not want to go to jail because he would be tortured and he was afraid they would electronically control his body and forcibly give him cocaine. There were six beer cans in the car, five of them empty, but no drugs or money.

Two days later, Seattle Police Detective Dag Aakervick interviewed Silva in the King County jail. Silva said that the robbery "wasn't a planned thing." He was not willing to provide any other information without getting something in exchange.

Psychologist David Dixon interviewed Silva for about six hours in October of 2004 and administered a variety of tests. Silva told Dr. Dixon that prior to the robbery, he had been using cocaine for five days and had not slept for two or three nights. Dr. Dixon concluded that Silva was experiencing paranoid delusions

3

associated with cocaine dependency at the time of the robbery. Delusional disorders include persecutorial concerns, bizarre behavior, some incoherence, and affected judgment. In Silva's case, sleep deprivation exacerbated his delusions and paranoid ideation. Dr. Dixon believed Silva was fearful and looking for safety because he thought he was being chased by people and harmed by technology and electronic devices. Caught in this dilemma, he was hopeful the police could save him from his pursuers and was "[a]t least in part" so motivated when he took the money.

Dr. Dixon conceded that Silva appeared to have the intent to go into the bank and take money. He also confirmed that he told the prosecutor in an interview that Silva likely robbed the bank to get money for drugs.

Judge Douglas McBroom found Silva guilty as charged. After noting Dr. Dixon's opinion "that defendant's ability to form the intent to deprive could have been impacted by associated delusions," the court concluded that Dr. Dixon's testimony "was speculative and conjectural, and unsupported by the facts." The court found "every indication was that the defendant knew exactly what he was doing, and for whatever reason formed the specific intent to deprive the savings and loan of money." The court concluded that Silva took the money "against Ms. Ridlon's will by the . . . use of immediate force, by grabbing the money out of Ms. Ridlon's hands, and threatened use of immediate force by violence or fear of injury to Ms. Ridlon, by coming into the savings and loan and demanding money . . . ."

Prior to sentencing, Judge McBroom recused and Judge Michael Trickey replaced him. Silva proceeded to file motions for arrest of judgment, a new trial, and to dismiss.

On August 18, 2005, Judge Trickey directed the parties to argue the merits of Silva's motions. Silva objected, saying there was nothing in the record to support his position and evidence needed to be developed. He also moved to recuse Judge Trickey, alleging that he "is a biased and partial jurist when it comes to pro se litigants[.]" Judge Trickey denied the motion to recuse or continue the matter and indicated he would return August 26th with his decision.

On August 26, Silva said he was not prepared to go forward and withdrew his motions. The Court ruled that the motions "are deemed withdrawn" and transferred the case for sentencing before a different judge. Silva then "fired" his standby counsel, whom the court allowed to withdraw, and proceeded pro se.

On September 2, 2005, Judge Richard McDermott sentenced Silva to 150 months confinement and 18 to 36 months community custody.

On September 7, 2005, Silva revived his previously withdrawn motions to dismiss, arguing that the court should consider them as post-trial motions under CrR 7.8. Judge McDermott declined to rule on the motions, citing his discretion to transfer them to the Court of Appeals under CrR 7.8.

Later that month, Judge McDermott received a motion for relief from judgment, a motion for new trial, and a motion to stay execution of the judgment. Judge McDermott denied the motions but his ruling was not filed. Five years later,

5

following the dismissal of his direct appeal, Silva inquired about the status of his motions for relief from judgment, a new trial, and a stay. By letter dated February 3, 2011, Judge McDermott informed him that he had denied the motions in October 2005, and that he would file his working copies of each of the motions.

Silva now appeals the 2005 ruling on his post-trial motions. We granted his motion to extend the time to file his notice of appeal.

## ANALYSIS

Silva contends the superior court abused its discretion in denying his three post-trial motions.[1] For the reasons set forth below, we disagree.[2]

### *Motion For New Trial*

Silva claims he received ineffective assistance of counsel and is therefore entitled to a new trial. To prevail on this claim, he must demonstrate both deficient performance and resulting prejudice.[3] There is a strong presumption of effective assistance, and Silva bears the burden of demonstrating the absence in the record of a strategic basis for the challenged conduct.[4] He has not met his burden.

Silva contends his counsel was ineffective for failing to establish that bank employees lied in their testimony and statements to police. He alleges the

---

[1] We review decisions on motions for relief from judgment or a new trial for abuse of discretion. State v. Smith, 159 Wn. App. 694, 699-700, 247 P.3d 775 (2011); State v. Meridieth, 144 Wn. App. 47, 53,180 P.3d 867 (2008).

[2] Given this disposition, we do not reach the State's argument that Silva's withdrawal and resubmission of his motions violated King County Local Rule 7(b)(7) (requiring disclosure of prior motion and showing of new circumstances "that would justify seeking a different ruling from another judge").

[3] State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

[4] McFarland, 127 Wn.2d at 334-35.

employees signed documents stating, "No Bait Money given," that police reports showed otherwise, and that surveillance footage from bank cameras would have shown the attempted use of bait money. But these allegations are based in part on matters outside the record,[5] and Silva fails to demonstrate how counsel's decision not to pursue this strategy was either professionally deficient or prejudicial.[6] Even accepting Silva's allegation that bait money was *offered*, that allegation is not inconsistent with the employees' out-of-court representation that no bait money was *"given"* (i.e., offered and received). And in any event, given the other undisputed evidence supporting the elements of the offense, there is no reasonable probability that any inconsistency on this tangential point would have affected the outcome of the trial had counsel exposed it.

Silva next contends his counsel was ineffective for mishandling the testimony of Kimberly Gregg and failing to establish the level of intoxication necessary for a successful voluntary intoxication defense. Prior to trial, Gregg stated in interviews that Silva "was acting like he was on crack or some other drug" and was "higher than a kite." At trial, she testified that he appeared to be coming

---

[5] State v. Bandura, 85 Wn. App. 87, 93-94, 931 P.2d 174 (1997) (If allegations in post-trial motions are based on matters outside the record, defendant must demonstrate that he has competent, admissible evidence that entitles him to relief; if the evidence is based on knowledge in the possession of others, he may not simply state what he thinks they would say, but must present their affidavits or other corroborative evidence.).

[6] Silva's related claim that the prosecutor suborned perjury with these witnesses is baseless and fails for essentially the same reasons. Nothing in the record shows that the witnesses gave false testimony regarding bait money, or that the prosecutor knowingly presented false testimony. See Schmitt v. Langenour, 162

down from a high and needed to get high again. Even assuming Gregg's trial testimony differed materially from her previous statements, Silva fails to demonstrate that defense counsel's handling of her testimony or the intoxication defense was deficient or prejudicial. The record, in fact, suggests the opposite.

The defense theory was that Silva was unable to form the requisite mental state because he had been using drugs for five days in a row and had not slept for 48 to 72 hours. Dr. Dixon testified that Silva's drug use and lack of sleep caused him to experience paranoid delusions that at least partly motivated his actions in the bank. Significantly, he testified that the withdrawal symptoms Gregg described were not inconsistent with this defense.

Silva also contends his counsel was ineffective for failing to investigate or pursue various leads he gave him. These include Silva's alleged disclosures to counsel that he ingested a significant amount of cocaine before and after the robbery, the cocaine may have been laced with an hallucinogenic substance, he purchased a laced substance from the same area on another occasion, there was some cocaine and paraphernalia containing drug residue in his car when he was arrested, his mother and her friend could testify to his intoxicated and delusional state on the day of the robbery, and he gave $900 of the bank money to a man for a cell phone. Again, Silva's claims are largely based on matters outside the record. He also provides no evidence supporting his bare assertion that additional

---

Wn. App. 397, 256 P.3d 1235 (2011) (no subornation of perjury absent evidence that reasonable prosecutor would have believed that she was suborning perjury).

investigation would have produced material evidence. There is no showing of either deficient performance or prejudice.

Last, Silva contends his counsel was deficient for allowing a witness to remain in the courtroom after she testified, and for failing to argue that the arresting officers destroyed evidence when they released his car to a tow yard and failed to take a blood sample that might have demonstrated his blood toxicity. But the court instructed the witness not to discuss testimony with the other witnesses, and Silva makes no showing that the witness disobeyed the court's instruction or had any adverse effect on the trial. He also fails to provide any authority or meaningful legal analysis supporting his destruction of evidence claims.[7] There is no basis to conclude that counsel's challenged acts or omissions were either deficient performance or prejudicial.

## Motion For Relief From Judgment

Silva contends the court also abused its discretion in denying his motion for relief from judgment. He fails, however, to demonstrate any basis for such relief under CrR 7.8.

He first argues that the sentencing judge abused his discretion in denying his request to continue the September 2, 2005 sentencing hearing. The denial of a continuance is reversible error only upon a showing of both an abuse of

---

[7] Saunders v. Lloyd's of London, 113 Wn.2d 330, 345, 779 P.2d 249 (1989) (appellate court will decline to consider issues unsupported by cogent legal argument and citation to relevant authority).

discretion and resulting prejudice.[8] Silva claims he needed a continuance because he lacked notice of the sentencing hearing and had not received sentencing documents. But the record indicates that he was notified of the sentencing hearing on August 26, 2005 and that he filed an affidavit of prejudice against the judge originally assigned to the September 2nd sentencing. The record further indicates that sentencing documents were served on his former standby counsel who, in turn, gave them to Silva. He also received prior notice of his alleged criminal history in the State's bail request and trial memorandum. In any event, in response to Silva's allegations, the sentencing court provided him copies of the sentencing documents, took a recess so he could review them, and then carefully reviewed each of the documents with him in open court. Silva fails to demonstrate either an abuse of discretion or prejudice.

Silva also claims he is entitled to relief from the judgment because the court was biased and his sentencing violated the appearance of fairness doctrine. These claim are raised for the first time on appeal and therefore need not be considered.[9] In any case, we presume that a judge acts without bias or prejudice[10] and a party asserting otherwise bears the burden of presenting evidence of actual or potential bias.[11] Silva contends bias is evidenced by a communication between the sentencing judge and the judge he replaced, the sentencing judge's alleged

---

[8] State v. Herzog, 69 Wn. App. 521, 524, 849 P.2d 1235 (1993).
[9] In re Guardianship of Cobb, 172 Wn. App. 393, 404, 292 P.3d 772 (2012).
[10] See State v. Chamberlin, 161 Wn.2d 30, 38, 162 P.3d 389 (2007); Wolfkill Feed and Fertilizer Corp. v. Martin, 103 Wn. App. 836, 841, 14 P.3d 877 (2000).
[11] State v. Dugan, 96 Wn. App. 346, 354, 979 P.2d 885 (1999).

unfamiliarity with the case, and the sentencing judge's failure to rule on various motions, including a motion to disqualify the prosecutor. These claims are either not supported by the record or fail to demonstrate actual or potential bias.

The communication between the judges, which was little more than a statement that the matter was ready for sentencing, does not establish bias. And nothing about the court's handling of the motions Silva filed in the middle of the sentencing hearing demonstrates bias. The court allowed Silva to file the motions[12] at sentencing and at a post-sentence hearing. It then ruled that it had discretion under CrR 7.8 to not rule on the motions and could refer them to the Court of Appeals. Also, contrary to Silva's assertions, the record indicates that the sentencing judge reviewed the sentencing materials prior to imposing sentence and was thus familiar with the case. There is no evidence of bias or partiality.

### Motion To Stay Execution of Judgment

Silva moved to stay the execution of the judgment below due to "government corruption" and "felony criminal activity by King County Prosecuting Attorneys, Superior Court Judges, and local, state and federal officials." He also alleged that corrections officials were interfering with his mail and legal files. But he failed both below and on appeal to demonstrate any valid basis to stay execution of his judgment and sentence. The State correctly points out, and Silva does not dispute, that the power to defer or suspend execution of a felony sentence has been abolished by statute. RCW 9.94A.575.

### *Delay in Filing Post-trial Orders*

As noted above, the superior court's October 2005 orders on Silva's motions for a new trial, relief from judgment, and a stay were not filed until 2011. Silva contends this delay "violates due process and the right to a speedy appeal." This contention is not supported by any argument or authority and therefore will not be considered.[13]

Silva argues that the sentencing court abused its discretion under CrR 7.8 when it declined to rule on the motions he filed at sentencing. This argument appears to raise matters that were not the subject of the post-trial motions at issue in this appeal. In any event, Silva relies on a version of CrR 7.8 that was not in effect when he was sentenced in 2005. Unlike the version of the rule cited by Silva, the version in effect in 2005 gave the trial court broad discretion to transfer a CrR 7.8 motion to the Court of Appeals "if such transfer would serve the ends of justice."[14] Silva fails to demonstrate an abuse of that discretion.

Affirmed.

WE CONCUR:

---

[12] These motions included a motion to disqualify the prosecutor, a motion to dismiss for fraud, and a motion for a "Garza" hearing.

[13] State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

[14] Former CrR 7.8 (2005).